**IN THE UNITED STATES BANKRUPTCY COURT FOR
THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| IN RE: | CASE NO. 16-06643 (EAG) |
| BUILDERS HOLDING., CORP., | Chapter 7 |
| DEBTOR. | |
| NOREEN WISCOVITCH RENTAS, TRUSTEE FOR THE ESTATE OF BUILDERS HOLDINGS CO., CORP., | ADV. PROCEEDING NO. 17-00012 |
| PLAINTIFF, | |
| v. | |
| ORIENTAL BANK and the PUERTO RICO FINANCING AUTHORITY | |
| DEFENDANTS. | |
| MAPFRE PRAICO INSURANCE COMPANY AND ENDURANCE ASSURANCE | |
| INTERVENOR-PLAINTIFF, | |
| v. | |
| ORIENTAL BANK, BUILDERS HOLDING CO., CORP., and the PUERTO RICO FINANCING AUTHORITY | |
| INTERVENOR-DEFENDANTS, | |
| ORIENTAL BANK, | |
| COUNTER-CLAIMANT, | |
| v. | |
| BUILDERS HOLDING CO., and MAPFRE PRAICO INSURANCE COMPANY AND ENDURANCE ASSURANCE | |
| COUNTER-DEFENDANTS | |

### Opinion and Order

Builders Holding Co., a general contractor, and the Puerto Rico Financing Authority entered into a contract for the construction of a project known as "Revitalización del Poblado de Boquerón en el Municipio de Cabo Rojo." Builders failed to make payments to the project's vendors. MAPFRE, the bonding company, sent a letter to the Financing Authority informing it of claims received under the bonds covering the project and that all further project payments, including progress payments, retainage, or additional claim amounts, had to be sent to MAPFRE and made payable jointly to Builders and MAPFRE. The Financing Authority failed to comply with MAPFRE's request and made a deposit of $537,924.18 to Builders' account at Oriental Bank. At the time of the erroneous deposit, Builders had a matured debt with Oriental on two lines of credit. As a consequence, on the same day the deposit was made, Oriental applied $464,757.60 to the outstanding balance of the lines of credit.

Builders filed a bankruptcy petition under chapter 11 and later filed this adversary proceeding against the Financing Authority and Oriental. The relevant procedural matters occurring thereafter are discussed in this court's previous opinion and order at docket 138 and in the opinion and order of the United States Court of Appeals for the First Circuit at docket 197.

The Court of Appeals, in its opinion, found that the bankruptcy court's decision was based exclusively on the Puerto Rico Civil Code provisions on the payment-in-error doctrine. However, neither the bankruptcy court nor the district court explained how the doctrine could be expanded to the facts here, that is, where there was one level/degree of removal/separation between the payor and the receiver. In remanding the case back to this court, the Court of Appeals posed three questions that were not addressed by this court: (1) whether Oriental's set-off is senior to MAPFRE's secured interest in the same collateral; (2) whether Oriental's set-off was a mutual debt; and (3) whether Oriental's set-off was otherwise valid under Puerto Rico law under other doctrines, such as unjust enrichment. Additionally, the Court of Appeals suggested that the questions of Puerto Rico law implicated in this controversy could be certified to the Puerto Rico Supreme Court.

During a hearing held on August 24, 2022, the parties agreed to suspend efforts to certify the matter to the Puerto Rico Supreme Court until after filing new summary judgment motions on the three questions posed by the Court of Appeals. After the filing of new summary judgment motions and after a hearing held on October 30, 2024, the parties supplemented their motions.

For the reasons set forth below, the court determines that no material issue of fact exists, and MAPFRE is entitled to summary judgment in its favor as a matter of law. Although the court centers its analysis around the three questions posed by the Court of Appeals, the change post-remand in legal strategy by the parties is also addressed in this opinion and order.

### I. Jurisdiction

This court has jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a), Local Civil Rule 83K(a), and the General Order of Referral of Title 11 Proceedings to the United States Bankruptcy Court for the District of Puerto Rico dated

July 19, 1984 (Torruella, C.J.).[1] Although Oriental had argued that this is a non-core proceeding that would exist outside of bankruptcy, it consented to this court hearing the matter and entering final judgment. (Adv. Dkt. No. 9, ¶14.)

## II. Uncontested Facts

The following facts are uncontested pursuant to Rule 56 and Local Civil Rule 56, made applicable to these proceedings by Bankruptcy Rule 7056 and Local Bankruptcy Rules 1001-1(b) and (d), as found in the record of this case and the statements of proposed uncontested facts filed by the parties:

### a. Indemnity Agreement between C.D. Builders and MAPFRE

On August 5, 2010, C.D. Builders, Inc.[2] executed an Agreement of Indemnity with MAPFRE. C.D. Builders promised to exonerate, hold harmless, and indemnify MAPFRE for any and all actual or potential loss as a consequence of the execution of bonds on its behalf. (Adv. Dkt. No. 205, Exhibit 1, Indemnity Agreement, p. 3 at ¶3.)

To comply with its indemnity obligations, C.D. Builders assigned to MAPFRE all rights, title, and interest in all bonded contracts, including its rights to any and all sums due or which may become due under all bonded contracts. (Adv. Dkt. No. 205, Exhibit 1, Indemnity Agreement, p. 4 at ¶4.)

Paragraph 8 ("Trust Funds") of the Indemnity Agreement states:

> All payments received for or on account of any CONTRACT shall be held in a trust fund to assure the payment of obligations incurred or to be incurred in the performance of any CONTRACT and for labor, materials, and services furnished in the prosecution of the work in any CONTRACT or any extension or modification thereof. All moneys due and to become due under any CONTRACT are also trust funds, whether in the possession of PRINCIPAL, INDEMNITORS or otherwise. The trust funds shall be for the benefit and payment of all obligations for which SURETY may be liable under any BONDS. The trust funds shall inure to the benefit of SURETY for any liability or loss it may have or sustain under any BOND, and this Agreement and declaration constitute notice of such trust.

(Adv. Dkt. No. 205, Exhibit 1, Indemnity Agreement, p. 5 at ¶8.)

### b. MAPFRE's UCC filings

On August 30, 2010, MAPFRE filed the Indemnity Agreement in the Department of State of Puerto Rico as a financing statement. (Adv. Dkt. No. 205, Exhibit 2, Official certification of financing statements registered in the records of the Department of State.)

---

[1] Unless otherwise indicated, all references to "Bankruptcy Code" or to specific statutory sections are to the Bankruptcy Reform Act of 1978, as amended, 11 U.S.C. §§ 101-1532.  All references to "Bankruptcy Rule" are to the Federal Rules of Bankruptcy Procedure, and all references to "Rule" are to the Federal Rules of Civil Procedure.  All references to "Local Bankruptcy Rule" are to the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Puerto Rico.  And all references to "Local Civil Rule" are to the Local Rules of Civil Practice of the United States District Court for the District of Puerto Rico.

[2] On June 29, 2016, C.D. Builders and CDC Maintenance Group, Corp. merged into the debtor, Builders Holding Co., Corp. (Adv. Dkt. No. 1, ¶14.)

3

**c. Cash Management and Loan Contract between Builders and Oriental**

On or about November 14, 2013, C.D. Builders executed a Cash Management Agreement with Oriental. (Adv. Dkt. No. 210, Oriental's Statement of Uncontested Facts, ¶1; Dkt. No. 51, Plaintiff's answer to Oriental's counterclaim, ¶2.) The Cash Management Agreement is not part of the record in this case. C.D. Builders was the owner of the bank account in which the money in controversy here was deposited. (Adv. Dkt. No. 210, Exhibit 20160430 Account Statement.)

On December 26, 2014, C.D. Builders executed with Oriental a line of credit agreement for two operational lines of credit. (Adv. Dkt. No. 210, Exhibit Loan Contract.) The credit lines were used to finance Builder's operational capital and costs of rendering services required under the "Yielded Contracts." (Adv. Dkt. No. 210, Exhibit Loan Contract, Section 2.5.) The "Yielded Contracts" include Builders' contracts with the Financing Authority. (Adv. Dkt. No. 210, Exhibit Loan Contract, Terms Defined, Section 1.1.)

Section 6.2 of the Loan Contract states in its pertinent part:

> **Section 6.2. Obligations and Inaction Agreements.** While any payment amount of the Credit Facilitation is pending or other advances made under the terms of this Contract, or there subsist the Bank's obligation to make advances under the terms of this Contract, ***unless there is obtained prior agreement in writing from the Bank, the Debtor is obligated to: (c) Disallow the existence of any mortgage, pledge, surrender, or any other lien or preferential agreement over [sic] any nature on the Collateral, except for:*** *...* ***(iii) deposits, pledges, and liens established or constituted to cover bonds for bids, contracts*** (except contracts for payment of monies), legal obligations, public services, appeals, ***indemnities, compliance and payment, or other similar obligations that arise in the ordinary course of the Debtor's business.***

(Adv. Dkt. No. 210, Exhibit Loan Contract, p. 14.) (Emphasis added to text in italics.)

**d. Oriental's UCC filings**

On November 20, 2013, a few days after executing the Cash Management Agreement with Builders, Oriental filed its first financing statement in the Department of State. (Adv. Dkt. No. 205, Exhibit 2, Official certification of financing statements registered in the records of the Department of State.)

The two "lines of credit were secured by Builder's accounts receivable and Deposit Account." (Opinion and Order of the First Circuit Court of Appeals, p. 5.) (footnote omitted). "Oriental Bank recorded its security interest in this collateral on December 30, 2014." (Opinion and Order of the First Circuit Court of Appeals, p. 5.) "Builders represented to Oriental Bank that the accounts receivable were not otherwise encumbered – even though the accounts receivable were subject to MAPFRE's security interest." (Opinion and Order of the First Circuit Court of Appeals, p. 5, fn. 3.)

**e. The Set-Off Provision**

Section 8.5 of the Loan Contract provides the following:

> **Section 8.5. Set-Off.** The Bank is herein authorized to at any time and from time to time to the extreme allowed by law, to compensate and apply any and all deposits (general or special, in installments or on demand, provisional or final) against any obligation by the Debtor that exists or may exist in the future with the

4

Bank. The Bank's rights under this Section are in addition to the other rights and remedies (including, but not limited to other compensation rights) that the Bank may have.

(Adv. Dkt. No. 210, Exhibit Loan Contract, p. 18.)

**f. Construction Contract**

On September 30, 2015, the Financing Authority and C.D. Builders entered into a contract for the construction of a project known as "Revitalización del Poblado de Boquerón en el Municipio de Cabo Rojo." (Adv. Dkt. No. 205, Exhibit 3, Construction Contract.) In consideration of the execution of the 2010 Indemnity Agreement, MAPFRE issued performance and payment bonds naming the Financing Authority as obligee and C.D. Builders as principal, to guarantee C.D. Builders' compliance of obligations under the construction contract; and its payment of labor and materials furnished in the project up to a limit of $3,070,480. (Adv. Dkt. No. 205, Exhibit 4, Performance Bonds.)

On February 16, 2016, MAPFRE sent a letter to the Financing Authority informing that it had received claims under the bonds in the project; that based upon its equitable right of subrogation and its secured rights under the Indemnity Agreement, the entire contract balance on the project was subject to MAPFRE's equitable lien and assignment rights; and pursuant to its legal and equitable subrogation rights, all further payments in connection with the project, including any progress payments, retainage, or additional claim amounts, had to be sent to MAPFRE and made payable jointly to C.D. Builders and MAPFRE. (Adv. Dkt. No. 205, Exhibit 5, MAPFRE's letter to the Financing Authority.)

On February 22, 2016, C.D. Builder's President also sent a letter to the Financing Authority telling it to send all future progress payments arising under the construction contract to MAPFRE and to make them payable jointly to C.D. Builders and MAPFRE. (Adv. Dkt. No. 205, Exhibit 6, C.D. Builder's letter to the Financing Authority.)

**g. The $537,924.18 electronic deposit made by the Financing Authority**

On May 23, 2016, the Financing Authority made an electronic deposit of $537,924.18 directly into C.D. Builder's bank account at Oriental for progress-payment money owed under the construction contract. (Adv. Dkt. No. 210, Exhibit 20160430, Bank Statement.) And, also on May 23, 2016, Oriental applied $464,757.60 of the money deposited into the account to pay off the outstanding lines of credit. (Adv. Dkt. No. 210, Exhibit 20160430, Bank Statement.) The next day, the Financing Authority attempted to reverse the electronic deposit. (Adv. Dkt. No. 205, Exhibit 7, p.2.; Opinion and Order of the First Circuit Court of Appeals, p. 7.) It is not until its reversal attempt that the Financing Authority disclosed that the transaction was related to "Vendor Payments". (Adv. Dkt. 205, Exhibit 9, p. 2. Reversal slip.)

As of the date of the erroneous deposit, MAPFRE paid $523,166.55 for labor, materials, and equipment furnished in the bonded project pursuant to its obligations under the bonds and had incurred net aggregate losses under all bonds issued on behalf of C.D. Builders that exceeded the amount of $537,924.18. (Adv. Dkt. No. 205, Exhibit 8, Declaration Under Penalty of Perjury executed by Roberto De Soto, Assistant Vice President of MAPFRE.)

On May 31, 2016, the Financing Authority sent a letter to Oriental stating that its electronic deposit was made by mistake and requesting that Oriental return its money. (Adv. Dkt. No. 205, Exhibit 11, May 31, 2016 letter.)

On June 29, 2016, C.D. Builders and CDC Maintenance Group, Corp. merged into the debtor, Builders Holding Co Corp. (Adv. Dkt. No. 1, ¶14.) On July 1, 2016, MAPFRE also sent a letter to Oriental seeking the return of the money. (Adv. Dkt. No. 205, Exhibit 12, July 1, 2016 letter.) On August 20, 2016, Builders Holding filed its chapter 11 bankruptcy petition. (Bankr. Dkt. No. 1.) On December 12, 2017, the Financing Authority sent another letter to Oriental demanding the immediate return of its money. (Adv. Dkt. No. 205, Exhibit 13, Letter sent by the Financing Authority to Oriental.)

As of March 21, 2018, MAPFRE incurred losses amounting to $1,069,849.13 due to payments made under the bonds for the project and $7,863,012.93 under all bonds issued on behalf of the debtor. (Adv. Dkt. No. 205, Exhibit 8, Declaration Under Penalty of Perjury executed by Roberto De Soto, Assistant Vice President of MAPFRE.)

**III. Summary Judgment Standard**

The standard for summary judgment is well-known. Pursuant to Rule 56 made applicable to these proceedings by Bankruptcy Rules 7056 and 9014(c), summary judgment is available "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 4 (1st Cir. 2010). The moving party bears the burden of showing that "no genuine issue exists as to any material fact" and that he is "entitled to judgment as a matter of law." Vega-Rodríguez v. P.R. Tel. Co., 110 F.3d 174, 178 (1st Cir. 1997).

Once a properly supported motion has been presented before the court, the opposing party "can shut down the machinery only by showing that a trial-worthy issue exists" that would warrant the court's denial of the motion for summary judgment. McCarthy v. Northwest Airlines, 56 F.3d 313, 315 (1st Cir. 1995). For issues where the opposing party bears the ultimate burden of proof, that party cannot merely "rely on the absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute." Id. However, not every factual dispute is sufficient to frustrate summary judgment; the contested fact must be material and the dispute over it must be genuine. Id. An issue is "genuine" if it could be resolved in favor of either party. A fact is "material" if it is potentially outcome-determinative. See Calero-Cerezo v. United States DOJ, 355 F.3d 6, 19 (1st Cir. 2004).

In assessing a motion for summary judgment, the court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging in all reasonable inferences in that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990) (citations omitted). The court may safely ignore "conclusory allegations, improbable inferences, and unsupported speculation." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) (citations omitted). However, there is "no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, [and] no room for the judge to superimpose his own ideas of probability and likelihood (no matter how

reasonable those ideas may be) . . . ." Greenburg v. P.R. Mar. Shipping Auth., 835 F.2d 932, 936 (1st Cir. 1987).

"Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." Adria Int'l Grp., Inc. v. Ferre Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001). Thus, "a court must rule on each motion independently, deciding in each instance whether the moving party has met its burden under Rule 56." United States v. 100,000 in United States Currency, 305 F. Supp. 3d 238, 245 (D. Mass. 2018) (quoting Dan Barclay, Inc. v. Stewart & Stevenson Servs., Inc., 761 F. Supp. 194, 197-98 (D. Mass. 1991).

"The [trial] court is freed from the usual constraints that attend the adjudication of summary judgment motions" when "'the basic dispute between the parties concerns the factual inferences . . . that one might draw from the more basic facts to which the parties have drawn the court's attention,' where 'there are no significant disagreements about those basic facts,' and where neither party has 'sought to introduce additional factual evidence or asked to present witnesses.'" EEOC v. Steamship Clerks Union 1066, 48 F.3d 594, 603 (1st Cir. 1995) (quoting Federacion de Empleados del Tribunal Gen. de Justicia v. Torres, 747 F.2d 35, 36 (1st Cir. 1984)). In those circumstances, "[t]he court may then engage in a certain amount of differential fact finding, including the sifting of inferences." Id.

Although the court has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts" it may do so at its discretion. Quintana-Dieppa v. Dep't of the Army, 130 F.4th 1, 11 (1st Cir. 2025). See Local Civil Rule 56(e).

**IV. Applicable Law and Analysis**

**a. Whether Oriental's Set-off is Senior to MAPFRE's Secured Interest in the Same Collateral**

The first question posed by the Court of Appeals is "whether the set-off that Oriental Bank asserts here is senior to the secured interest that MAPFRE has in the same collateral under Puerto Rico law . . . ." (Opinion and Order of the First Circuit Court of Appeals, p. 17.) Because after remand Builders and Oriental changed their legal tack and both recorded security interests in the same collateral, the court also analyzes which of the parties recorded security interest is entitled to priority. The court must also determine whether the 1996 version or the 2012 version of Article 9 of the Uniform Commercial Code applies to the facts of this case. Some statutory history and background are required first.

Initially, the Puerto Rico Commercial Transactions Act, Law Number 208-1995 of August 17, 1995, adopted four Articles of the model UCC: but not Article 9. See Statement of Motives, Law No. 241-1996 of September 19, 1996. (Dkt. No. 240, Exhibit No. 2.); see also Wiscovitch-Rentas v. Banco Popular de P.R., 600 B.R. 132, 145 (1st Cir. B.A.P. 2019) (Explaining how only portions of the model UCC were first adopted in Puerto Rico). However, on September 19, 1996, the Commercial Transactions Act was amended to adopt, effective January 17, 1997, three more Articles of the model UCC: including Article 9. See Law No. 241-1996 of September 19, 1996. (Dkt. No. 240, Attachment No. 2.) The Commercial Transactions Act was amended again, effective January 17, 2013, by Law Number 21-2012 of

7

January 17, 2012. Law 21-2012 replaced the existing Article 9 with a new Article 9, P.R. Laws Ann. tit. 19, §§ 2211-2409. See Statement of Motives, Law No. 21-2012 of January 17, 2012. Section 9-709 of Article 9 of Law 21-2012 -- a "grandfather" clause -- provides that if the relative priorities of conflicting claims to collateral were established before Law 21-2012 took effect, Article 9 of Law 241-1996 determines their priority. P.R. Laws Ann. tit. 19, § 2409.[3]

MAPFRE filed its financing statement with the Department of State on August 30, 2010, perfecting its security interest over the proceeds of the construction contract under the former Article 9 of Law 241-1996.  Oriental filed its first financing statement with the Department of State on November 20, 2013, and recorded its security interest over MAPFRE's collateral on November 30, 2014, while Article 9 of Law 21-2012 was in effect.

Under Section 9-327 of Article 9 of Law 21-2012, "a security interest held by the bank with which the deposit account is maintained has priority over a conflicting security interest held by another secured party." P.R. Laws Ann. tit. 19 § 2277(3). And under section 9-340 of Article 9 of Law 21-2012, "a bank with which a deposit account is maintained may exercise any right of recoupment or set-off against a secured party that holds a security interest in the deposit account." P.R. Laws Ann. tit. 19, § 2290(a). Section 9-340 of Law 21-2012 also provides that "the application of this chapter to a security interest in a deposit account does not affect a right of recoupment or set-off of the secured party as to a deposit account maintained with the secured party." P.R. Laws Ann. tit. 19, § 2290(b).

Because there are conflicting claims to the collateral and MAPFRE perfected its security interest under Article 9 of Law 241-1996 and Oriental claimed it had a higher-ranking security interest under Article 9 of Law 21-2012, the grandfather clause of the latter law provides that the relative priorities of those conflicting claims over the collateral are governed by Article 9 of Law 241-1996. P.R. Laws Ann. tit. 19, § 2409.

Article 9 of Law 241-1996 does not give Oriental an automatic security interest in Builder's deposit account with priority over MAPFRE's security interest. Section 9-327 of Law 21-2012 was not part of Article 9 of Law 241-1996. Rather, section 9-312(5)(a) of Article 9 of Law 241-1996 gives priority to the first security interest perfected by the filing of a financing statement in the Department of State. And, again, MAPFRE was the first to file its financing statement. "[T]he general rule of priority is that the security interest whose financing statement was registered first at the Puerto Rico Department of State shall be superior over the security interest whose financing statement was registered later." Eurobank v. Westernbank P.R. (In re Deckers Constr., Inc.), 461 B.R. 143, 148 (Bankr. D. P.R. 2011). "This general maxim is known as the 'first in time, first in right rule.'" Id.

Article 9 of Law 241-1996 expressly excluded from its coverage "any right of setoff." (Section 9-104(i) of Law 241-1996 at Dkt. No. 240, Attachment No. 2, pp. 193-94). When an

---

[3] See Desarrolladora Caribe v. Ven-Lour Enterprises, Inc., 198 D.P.R. 290, 301 (2019) (Applying former Article 9 because the concerned transaction took place before the implementation of the 2012 Transactions Act); PR Asset Portfolio 2013-1 International, LLC v. Tropical Heifers, Inc., 206 D.P.R. 559, 571 (2021) (Former Article 9 requirements to perfect a security interest apply when the facts occurred during its validity); see also Interbusiness Bank, N.A. v. First Nat'l Bank, 318 F. Supp. 2d 230, 238 (M.D. Pa. 2004) ("This section functions as a grandfather clause, protecting interests that enjoyed priority under former Article 9 but would lose that status under the revised provisions.").

aspect of a controversy is not addressed by a special provision, such as Law 241-1996, the Commerce Code and the Civil Code operate as suppletory law. See St. Paul Fire & Marine Ins. Co. v. Caguas Federal Sav. & Loan Asso., 867 F.2d 707, 710 (1st Cir 1989). In Puerto Rico, the right of set-off, known as compensation, is created and governed by the Puerto Rico Civil Code. United Structure of Am., Inc. v. G.R.G. Eng'g., 9 F.3d 996, 1000 (1st Cir. 1993). The court addresses set-off under Puerto Rico law in the next section of this opinion and order.

Oriental's position is further undercut by section 6.2 of the Loan Contract which in pertinent part reads:

> **Section 6.2. Obligations and Inaction Agreements**. While any payment amount of the Credit Facilitation is pending or other advances made under the terms of this Contract, or there subsist the Bank's obligation to make advances under the terms of this Contract, unless there is obtained prior agreement in writing from the Bank, *the Debtor is obligated to: (c) **Liens.** Disallow the existence of any mortgage, pledge, surrender, or any other lien or preferential agreement over any nature on the Collateral, except for: ... (iii) deposits, pledges, and liens established or constituted to cover bonds for bids, contracts* (except contracts for payment of monies), legal obligations, public services, appeals, *indemnities, compliance and payment, or other similar obligations that arise in the ordinary course of the Debtor's business.*

(Adv. Dkt. No. 210, Exhibit Loan Contract, p. 14.) (Emphasis added to text in italics.)

Without section 6.2, the Loan Contract would have run afoul of Puerto Rico's Law No. 388-1951 of May 9, 1951, P.R. Laws Ann. tit. 22, §§ 47-58. Law 388-1951 requires that "[e]very contractor who is awarded a contract for the construction, reconstruction, enlargement, alteration, or preparation of any public work, shall post a payment bond on behalf of the Commonwealth of Puerto Rico, which shall be obligatory and effective on and after the date on which the contract is executed." P.R. Laws Ann. tit. 22, § 47. "Work" or "Public Work" is defined in Law 388-1951 as "any construction, reconstruction, alteration, extensions, or improvements, made under a contract awarded to a contractor by the Commonwealth of Puerto Rico. P.R. Law tit. 22, § 58. "The Commonwealth of Puerto Rico" is defined in Law 388-1951 to include "The Commonwealth of Puerto Rico, the departments, agencies, and instrumentalities thereof, the municipal governments, and the Government of the Capital." P.R. Law Ann. tit. 22, § 58. Plainly, Builder's construction contracts with the Puerto Rico Financing Authority were subject to Law 388-1951.

The purpose of Law 388-1951 is "[t]o secure the payment of salaries and wages and payment for materials supplied for public works." Preamble to P.R. Law No. 388-1951 of May 9, 1951. The Supreme Court of Puerto Rico has stated that when a bond is issued to perform a public construction project, the bond, the contract and the legal provisions requiring such bond, form a single obligational body. Cristy & Sánchez v. Commonwealth, 84 D.P.R. 234, 239 (1961); see also Ortiz Rolón v. Armando Soler Auto Sales, Inc., 202 D.P.R. 689, 699 (2019). Here, to issue the two credit lines Oriental relied on several government construction contracts, referred to in the Loan Contract as the "Yielded Contracts." (Adv. Dkt. No. 210, Exhibit Loan Contract, Section 2.5 and Section 1.1.) The Loan Contract here authorized the creation of liens to comply with the legally required bond. (Dkt. No. 210, Exhibit Loan Contract, Section 6.2.(c).) Thus, although Builders

represented to Oriental that its accounts receivable were not already encumbered, the court may safely ignore the "improbable inference" that Oriental did not know otherwise. See Medina-Munoz, 896 F.2d at 8.

The parties did not specifically reference section 6.2 of the Loan Contract. Although the court is not required to consider parts of the record not specifically referenced by the parties, it may do so at its discretion. See Quintana-Dieppa v. Dep't of the Army, 130 F.4th 1, 11 (1st Cir. 2025). Parties are not permitted to "pick and choose" some parts of an agreement and reject or ignore others. See Chicago Dist. Council of Carpenters Pension Fund v. Fonsa Constr., Inc., 2000 U.S. Dist. LEXIS 14577, *1 (N.D. Ill. Oct. 2, 2000). Parties are obligated to the express terms of a contract and its consequences. See Oriental Bank v. Perapi, 192 D.P.R. 7 (2014). And "contractual interpretation does not start and end on reading one phrase in isolation." Zhao v.CIEE Inc., 3 F.4th 1, 7 (1st Cir. 2021). Thus, to properly interpret both the terms and legality of the Loan Contract, the court had to review and consider the entire contract, including its section 6.2.

The court turns now to the second question posed by the Court of Appeals.

**b. Whether Oriental's Set-off Was a Mutual Debt**

The second question posed by the Court of Appeals is "whether Oriental Bank's set-off was a 'mutual debt.'" The Bankruptcy Code does not create a right to set-off, but section 553 provides that a right to set-off that exists under non-bankruptcy law may be preserved in bankruptcy. Citizens Bank v. Strumpf, 516 U.S. 16, 18 (1995). Set-off is governed by the Puerto Rico Civil Code. United Structure of Am., Inc., 9 F.3d at 1000.

The Puerto Rico Civil Code of 1930 states that "compensation shall take place when two persons, in their own right, are mutually creditors and debtors of each other." P.R. Laws Ann. tit. 31, § 3221.[4] For compensation to apply, the following requirements must be met:

(1) That each of the persons bound should be so principally, and that he be at the same time the principal creditor of the other;

(2) That both debts consist of a sum of money or, when the things due are perishable, that they be of the same kind and also of the same quality, if the latter should have been stipulated;

(3) That both debts are due;

(4) That they be determinable and demandable;

(5) That none of them is subject to any retention or suit instituted by a third person, and of which due notice was given to the debtor.

P.R. Laws Ann. tit. 31, § 3222. The court notes that the Court of Appeals expressly rejected the application of the Puerto Rico Civil Code doctrine of compensation against a surety. Am. Fire & Cas. Co. v. First Nat'l City Bank, 411 F.2d 755, 758 (1st Cir. 1969) ("[M]ost importantly,

---

[4] Because the set-off in this case occurred on May 23, 2016, the 1930 Puerto Rico Civil Code applies.

10

compensation is not binding on a surety, 31 L.P.R.A. § 3223.").[5] But the court does not stop the analysis of compensation there.

The first requirement that both parties must be debtor and creditor principally of each other requires that the credit to be compensated belongs rightfully to the one compensating it. Tomo XVI, Vol. 1 Manuel Albaladejo & Sylvia Diaz Alabart, Comentarios al Código Civil y Compilaciones Forales, (Edersa, Madrid 2nd Ed., 1991), p. 531. The Supreme Court of Puerto Rico has stated that public funds disbursed for the performance of a public construction project do not belong to a contractor or a supplier until the project is completed and accepted by the government. See Stump Corp. v. Superior Court of P.R., 99 D.P.R. 179 (1970); see also Román Fonseca v. Ruiz Gutierrez, 160 D.P.R. 116 (2003). As the Puerto Rico court stated it, "it is logical to anticipate that the contractor will use the periodic payments for the continuation of the works" to avoid jeopardizing the completion of the construction.  Stump Corp., 99 D.P.R. at 182.

When the Financing Authority made the electronic deposit into Builders' account at Oriental, the Boquerón Project was not yet completed. The deposit was a progress payment from the project owner. Those public funds did not rightfully belong to Builders and, therefore, the first requirement of compensation is not met here.

Also, section 553(a) will only make applicable Oriental's pre-petition right to set-off where four conditions exist: (1) the creditor holds a prepetition claim against the debtor; (2) the creditor also owes a pre-petition debt to the debtor; (3) the claim and debt are mutual; and (4) the claim and debt are valid and enforceable. 5 Richard Levin & Henry J. Sommer, Collier on Bankruptcy ¶ 553.01[1] (16th ed. 2026). Under section 553, debts cannot be set-off unless they are mutual and mutuality requires that those debts be owed between the same parties, acting in the same capacity. 5 Collier on Bankruptcy ¶ 553.03.[3].

Generally, when a bank account is not a trust account, the account contract creates "the normal debtor-creditor relationship with its customer." Bowery Sav. Bank v. Colonial Mortg. Bankers Corp., 1991 U.S. Dist. LEXIS 21717 (D. P.R. Oct. 31, 1991). "However, when a fund is deposited for a 'special purpose' it is held in trust for the depositor, rather than 'owed' to the depositor. Because of this distinction, the requisite mutuality of obligation is not present with special purpose funds and set off is not permitted." In re Ben Franklin Retail Store, Inc., 202 B.R. 955, 957 (Bankr. N. D. Ill. 1996).

"Mutuality under section 553 may be found to be lacking if the creditor claiming the right of setoff knew or should have known that the funds at issue constituted some other creditor's collateral." 5 Collier on Bankruptcy ¶ 553.12.

> A well recognized limitation to the right of set-off exists where a bank has knowledge of a third person's interest in deposited funds, or notice of facts sufficient to put the bank upon inquiry as to the character of the deposit, and the bank's right of set-off may be subject to the rights of the third party.

---

[5] That provision of the Civil Code reads: "Notwithstanding the provisions of the preceding section [on the requisites for compensation], the surety may oppose compensation with regard to what the creditor may owe his principal debtor." P.R. Laws Ann. tit. 31, S 3223.

Barber v. Princeville State Bank (In re Ostrom-Martin, Inc.), 161 B.R. 800, 803 (Bankr. C.D. Ill. 1993); see also In re Milano Textiles, Inc., 38 B.R. 964 (Bankr. D. Mass. 1984); In re Tonyan Constr. Co., 28 B.R. 714 (Bankr. N.D. Ill. 1983). But cf. In re Property Leasing & Management, Inc., 46 B.R. 903, 908 (Bankr. E.D. Tenn. 1985) ("[A] number of courts have held that a bank's knowledge that the nature of the depositor's business is such that it customarily handles the funds of others is not sufficient to charge the bank with notice that deposited funds may belong to others.").

Multiple courts have ruled that when payment and completion bonds are required by law, as is the case in Puerto Rico, creditors have constructive notice that the contractor will be obtaining surety bonds on any government contract. United States Fid. & Guar. Co. v. APAC-Kansas, Inc., 151 F. Supp. 2d 1297 (D. Kan. 2001). In re J.B. Constr. Co., 2011 Bankr. LEXIS 802 (Bankr. D. Neb. March 4, 2011); Standard Acc. Ins. Co. v. Federal Nat'l Bank, 112 F.2d 692, 695 (10th Cir. 1940) (A bank is "charged with knowledge that public contractors are required to give bond conditioned for the performance of their contracts."). And as discussed above, in Puerto Rico under Law 388-1951, "[e]very contractor who is awarded a contract for the construction . . . of any public work, shall post a payment bond in behalf of the Commonwealth of Puerto Rico, which shall be obligatory . . . ." P.R. Laws Ann. tit. 22, § 47. Additionally, Law 388-1951 requires the contractor "to pay punctually, as they fall due, the bills and invoices presented to him by any natural or artificial persons who have supplied, sold, or delivered materials, equipment, and tools for the work." P.R. Laws Ann. tit. 22, § 49. Law 388-1951 further establishes an absolute statutory preference in favor of workers and employees, superior to any other debts of the contractor. P.R. Laws Ann. tit. 22, § 50.

Here, to issue the credit lines Oriental relied on several government construction contracts. (Adv. Dkt. No. 210, Exhibit Loan Contract, Section 2.5. and Section 1.1.) The construction contract incorporates the bond and the legal provisions that require it. Cristy & Sánchez, 84 D.P.R. at 239. The Loan Contract authorized the creation of liens to comply with the legally required bond. (Dkt. No. 210, Exhibit Loan Contract, Section 6.2.(c).) Thus, Oriental had at the very least constructive knowledge of the nature of the funds deposited by the Financing Authority in Builders' bank account.

"The mutuality mandate is strictly construed." Faasoa v. Army & Air Force Exchange Serv. (In re Faasoa), 576 B.R. 631, 638 (Bankr. S.D. Cal. 2017). In this case, there is no mutuality under section 553(a): (1) MAPFRE had a preferential security interest on progress payments resulting from Builders' governmental construction projects and notice was given through the presentation of its financing statement in the Department of State. Builder's Indemnity Agreement with MAPFRE was also easily known with minimal due diligence by Oriental. (2) Under the Loan Contract, Oriental authorized Builders to create preferential liens to cover payment and performance bonds. (3) Oriental is charged with knowledge that, under Puerto Rico law, Builders was required to obtain performance and payment bonds for government construction projects. (4) The Puerto Rico Supreme Court has stated that Law No. 388-1951, the bond documents and the government construction contract all form a single obligational body. And Oriental relied on Builders' government contracts to enter into the Loan Contract. Thus, Oriental had sufficient information to know that any set-off rights it could possess were subordinated to the

12

statutory rights of Builders' workers and suppliers and to MAPFRE's rights under the Indemnity Agreement.

Also, the Puerto Rico courts admit evidence to show the nature or character of deposits in general accounts. In Oriental Bank v. Asoc. de Miembros De La Policía de P.R., 2020 P.R. App. LEXIS 1272 (P.R. App. July 31, 2020) the appellate court found that Oriental could not set-off legislative funds deposited in a general account which were granted pursuant to a legislative grant. The legislature authorized the use of the funds by the Police Members Association for specific purposes and, therefore, the funds could not be used for any other purpose or for the benefit of third parties such as Oriental. See also Saldaña v. Rivera, 2009 PR App. LEXIS 161 (P.R. App. Feb. 27, 2009) (The appellate court found that neither the account owner nor the bank acquired domain or control over certain funds deposited in a savings bank account, when the funds belonged to a third party and were deposited in said account pursuant to a mandate (agency) contract.).

### c. The Unjust Enrichment Doctrine

The third question posed by the Court of Appeals is whether "Oriental's setoff is otherwise valid under Puerto Rico law, which may implicate other doctrines such as the doctrine of unjust enrichment." The "unjust enrichment doctrine is a general principle of law based on the equity that pervades the entire body of laws." Ortiz Andújar v. Commonwealth, 122 D.P.R. 817, 822 (1988). To apply the doctrine of unjust enrichment the following requirements must be met: (1) the existence of an enrichment; (2) A correlative impoverishment; (3) a connection between the impoverishment and the enrichment; (4) absence of cause to justify the enrichment; and (5) lack of a legal provision which precludes application of an enrichment without cause. Id.; Sánchez Torres v. Fundación Dr. Manuel de la Pila Iglesias, 186 D.P.R. 503, 516 (2012).

In this case, Oriental was enriched by the correlative impoverishment of MAPFRE. And, because MAPFRE was entitled to the funds erroneously deposited in the bank account, its impoverishment is connected to Oriental's enrichment. But the unjust enrichment doctrine may not be applied if there is a contractual obligation. Ortiz Andújar, 122 D.P.R. at 830. Here, the set-off was provided for in the Loan Contract between Builders and Oriental. Therefore, the fourth requirement is not met, and the unjust enrichment doctrine is inapplicable to the facts of this case.

### d. The Equitable Subrogation Doctrine

To address the "other doctrines" part of the third question posed by the Court of Appeals, the court also considers equitable subrogation. "The equitable principle is that when one, pursuant to obligation -- not a volunteer, fulfills the duties of another, he is entitled to assert the rights of that other against third persons." Nat'l Shawmut Bank, 411 F.2d at 843-44. In the context of a public construction project, the Supreme Court has stated that "a surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed." Pearlman v. Reliance Ins. Co., 371 U.S. 132, 137 (1962). Sureties' subrogation rights are threefold as they may "stand in the shoes of 'either (1) the contractor whose obligations are discharged, (2) the owners to whom it was bound, or (3) the subcontractors whom it paid.'" Kitaeff v. Peabody Constr. Co. (In re Bay State York Co.), 162 B.R. 922, 933 (Bank. D. Mass. 1993). This equitable principle is known as the Pearlman doctrine based on the Supreme Court's opinion in Pearlman, 371 U.S. 132. In Pearlman, the payment bond at issue was required for federal construction projects pursuant to the Miller Act, 40 U.S.C. § 3131 et seq. But the principles asserted in Pearlman

13

have been extended beyond the Miller Act. <u>Bendon v. Andrade & Assocs. (In re Colt Engineering, Inc.)</u>, 288 B.R. 861, 868 (Bankr. C.D. Cal. 2003).

The Court of Appeals recognized that Puerto Rico's law for government projects and the obligation to issue a payment and performance bond aligns with the Pearlman doctrine and equitable subrogation principles. <u>See</u> <u>Insite Corp. v. Walsh Constr. Co. P.R. (In re Insite Corp.)</u>, 906 F.3d 139 (1st Cir. 2018); <u>Segovia Dev. Corp. v Constructoria Maza, Inc.</u>, 628 F. 2d 724 (1st Cir. 1980). Pursuant to equitable subrogation principles, the Court of Appeals determined that retainages and progress payments in possession of the owner of a construction project are a surety's property to the extent necessary to reimburse it for the payment of the laborers and materialmen and other costs and that such rights prevail over secured creditors. <u>See</u> <u>Framingham Trust Co. v. Gould--National Batteries, Inc.</u>, 427 F.2d 856 (1st Cir. 1970); <u>see also</u> <u>Segovia Dev. Corp.</u>, 628 F.2d at 729 ("Under both the general common and commercial law and under Puerto Rican law, laborers and materialmen have rights to contract retainages which are superior to those of general creditors."). Also, the Puerto Rico Supreme Court has stated that sureties' subrogation rights are superior to claims made by a government taxing authority because its rights relate back to the date that an indemnity contract with an assignment clause is executed. <u>New Hampshire Ins. Co. v. García Passalacqua</u>, 206 D.P.R. 105 (2021). The Puerto Rico Supreme Court has explained that there are public policy considerations to uphold the subrogation principle in construction contracts "to propitiate the prompt payment to those who furnish their labor and materials in another's work." <u>Am. Sur. Co. v. Superior Court of P.R.</u>, 97 D.P.R. 452, 455 (1969). "[E]quitable subrogation principles remain applicable in bankruptcy." <u>Dwyer v. Ins. Co. (In re Pihl, Inc.)</u>, 560 B.R. 1, 9 (Bank. D. Mass. 2016).

Several courts have concluded that a surety's right to equitable subrogation is not a security interest governed by the UCC. <u>See</u> <u>United Prairie Bank v. Molnau Trucking LLC</u>, 2025 Minn. LEXIS 329 (Minn. July 16, 2025); <u>Alaska State Bank v. General Ins. Co.</u>, 579 P.2d 1362 (Alaska 1978); <u>United States Fidelity & Guaranty Co. v. First State Bank</u>, 208 Kan. 738. Syl. para. 5, 494 P.2d 1149 (1972). These decisions are consistent with the decision of the Court of Appeals in <u>Nat'l Shawmut Bank</u>:

> In this case there is confusion because the tendency is to think of the surety on Miller Act payment and performance bonds as standing in the shoes only of the entity it "insures" -- the contractor. So long as this one-dimensional concept prevails, logic compels the surety to be assessed as merely one of the contractor's creditors, and to be subject to the system of priorities rationalized by the Uniform Commercial Code. But the surety in cases like this undertakes duties which entitle it to step into three sets of shoes. When, on default of the contractor, it pays all the bills of the job to date and completes the job, it stands in the shoes of the contractor insofar as there are receivables due it; in the shoes of laborers and material men who have been paid by the surety -- who may have had liens; and, not least, in the shoes of the government, for whom the job was completed.

<u>Nat'l Shawmut Bank</u>, 411 F.2d at 844-45.

The Court of Appeals conceded that requiring sureties to file financial statements would "rationalize the system of financing public contracts." <u>Nat'l Shawmut Bank</u>, 411 F.2d at 849.

14

However, "equitable subrogation is too hardy a plant to be uprooted by a Code which speaks around but not to the issue." Id.  Also, the Court of Appeals stated again that a surety's right of subrogation survived the passage of the UCC. Framingham Trust Co., 427 F.2d at 857.

Following the teachings of Nat'l Shawmut Bank, the Court of Appeals in the Am. Fire & Cas. Co. case held that a surety had a "superior claim" over an assignee bank to progress payments earned prior to a contractor's default that had not yet been paid. Am. Fire & Cas. Co., 411 F.2d at 758 ("It is the surety's performance which frees the funds, and, in our view, the surety is entitled to them."). But, adhering again to the holding in Nat'l Shawmut Bank, the Court of Appeals held that the surety could not recover 16 progress payments earned and paid out to the assignee bank prior to the contractor's default. Am. Fire & Cas. Co., 411 F.2d at 758. The implication is that the surety could have recovered those 16 progress payments from the bank if they had been paid out after the contractor's default.

Pursuant to equitable subrogation principles and the statutes that regulate governmental construction projects in Puerto Rico, MAPFRE's interest in the funds deposited in Builder's account is superior to the rights of other creditors of Builders, including Oriental. On February 16, 2016, MAPFRE asserted its subrogation rights over the balance of the Boquerón Project. Upon payment on the bonds, MAPFRE's right relates back to the date when the indemnity contract with the assignment clause was executed, that is, August 30, 2010.

**e. The Common Law**

Oriental's argument -- that even if the former Article 9 of Law 241-1996 did not allow it to perfect by control its interest in Builders' deposit account, Oriental's set-off was still senior to MAPFRE's secured interest in the same collateral under common law principles – is addressed last. Generally, federal courts "can't use stateside common law to 'fill[] gaps in the civil law system' unless the Civil Code and the Supreme Court of Puerto Rico are silent on the issue." Rivera-Colón v. AT&T Mobility P.R., Inc., 913 F.3d 200, 209 (1st. Cir. 2019) (citing Guevara v. Dorsey Labs., Div. of Sandoz, Inc., 845 F.2d 364, 366 (1st Cir. 1988)). There are no gaps to fill here in the Puerto Rico law.

Perhaps more importantly, the plea to import foreign law is an attempt by Oriental to obtain something it neither negotiated with Builders nor had any legal reason to expect. Once Builders defaulted on the construction contract and MAPFRE notified the Financing Authority of the default and assignment of future progress payments, the Financing Authority was required to send all subsequent progress payments to MAPFRE. If that had happened, plainly Oriental would not be making any claim on the collateral. Given that and the caselaw from the Supreme Court of Puerto Rico protecting public funds allocated for construction projects from creditors like Oriental, the bank would fare no better in local courts.

**V. Conclusion**

For the reasons stated above, the court finds that Builders had a priority interest over the progress payment deposited by the Financing Authority in Builders' deposit account. Therefore, the motion for summary judgment filed by MAPFRE (Adv. Dkt. No. 205) as supplemented (Adv. Dkt. No. 240) is granted and Oriental's motion for summary judgment and opposition to MAPFRE's summary judgment (Adv. Dkt No. 209) as supplemented (Adv. Dkt. No. 232) is

15

denied. Oriental is ordered to turn over to MAPFRE and the Chapter 7 trustee, jointly, the money Oriental set-off from Builders' bank account. A separate judgement shall be entered.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 16 day of March, 2026.

Edward A. Godoy
United States Bankruptcy Judge

16